FILED
IN CLERKS OFFICE

Valentine Underwood
# K-84486, PWC-202
P.O. Box 213040
Stockton, CA 95213

Petitioner in pro se

2021 SEP 15  PM 12: 19

U.S. DISTRICT COURT
DISTRICT OF MASS.

# UNITED STATES DISTRICT COURT

# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **Valentine Underwood,**<br><br>            Petitioner,<br><br>    v.<br><br>**Commonwealth of Massachusetts,**<br><br>            Respondent. | No._____<br>(Mass. SJC No. FAR-27428)<br><br>**Petition for Writ of Habeas Corpus<br>by a Prisoner in State Custody;<br>Memorandum of Points and Authorities<br>in Support**<br><br>(28 U.S.C. § 2254) |

Petitioner Valentine Underwood respectfully petitions this honorable court pursuant to 28 U.S.C. § 2254 for a writ of habeas corpus by a person in state custody, and alleges:

**Statement of the Case**

On September 17, 2010, an Essex County grand jury returned indictments charging Underwood with a May 20, 1988, kidnapping (G.L. c. 265, § 26, as amended through St. 1979, c. 465, § 1) and aggravated rape (G.L. c. 265, § 22, as amended through St. 1980, c. 459, § 6). (Essex County Superior Court No. ESCR2010-1137.)

At the time of the indictments Underwood was incarcerated on two counts of first degree murder (Penal Code §187) and sentenced to two terms of Life Without the Possibility of Parole (LWOP). Underwood has been incarcerated since 1991.

1

Underwood waived his right to counsel and represented himself with the aid of appointed standby counsel. On May 5, 2013, Underwood filed a motion to dismiss the indictments, which was denied on December 30, 2013.

Underwood was tried before a jury from May 13 through May 19, 2014 and convicted as charged of aggravated rape by reason of vaginal intercourse, finding the rape occurred during the commission of all three proposed predicate offenses: kidnapping, assault and battery with a dangerous weapon (knife), and assault with a dangerous weapon. The judge sentenced him for aggravated rape to a 30-40 year state prison term, and for kidnapping to a concurrent 9-10 year term, to be served after his two LWOP sentences.

Underwood timely appealed. On April 21, 2020, Underwood petitioned the Supreme Judicial Court for Further Appellate Review (FAR), which was denied on June 11, 2020.

### Statement of Facts

**The prosecutor falsely tells the grand jury that Underwood was previously convicted for rape**

On September 17, 2013, a hearing was held on Underwood's motion to dismiss the indictment due to the prosecutor knowingly presenting false prejudicial evidence to the grand jury. The first piece of false evidence was introduced by ADA MacDougall, when presenting the rape charge, she stated "Said defendant, having been previously convicted of said offense." (Tr. GJ: 3, 4.) This incorrect prejudicial information that Underwood had a prior conviction of rape was said to the grand jury.

**Underwood is denied access to discovery and other needed legal materials**

Underwood was consistently prevented from preparing for trial, defending himself, examining witnesses, and seeing evidence due to his lack of access to discovery, legal books, legal materials, and limited law library access. The effects of these unconstitutional denials were

2

evident throughout the trial, and Underwood repeatedly complained of them:

**[May 3]**

UNDERWOOD: I've been housed in 10-block, Your Honor. Unfortunately they came in my cell and threw all of my legal stuff away, which I addressed Court with, being subjected and, you know, they're hampering me from defending this matter. (Tr. II/81.)

...

COURT: Okay. I need to clarify what we're going to do about summonses for additional witnesses.

Have you had a chance, Mr. Underwood, to communicate directly or indirectly with [the prosecutor] about what you want to do and what she might be willing to expedite you doing it? Has that happened at [all]?

No. Okay.

...

**[May 14]**

UNDERWOOD: ... Your Honor, if Court would take notice, the first thing is, Your Honor, I came here from Walpole State Prison, 10-block. I had submitted prior documents to Court asking Court's assistance with giving me law library legal books out of my property. I made it known that I was being denied these things and it's always been denied. And I asked Court for assistance. Mr. Collins had called, actually called and wrote letters to the superintendent for me. This is months ago, Your Honor, months ago. (Pet. Ex. 7.)

I came here defending myself in this matter as a pro se. With all the things, the situation I was confronted with that was hampering me in my ability to defend myself, I'm here and I'm doing the best I can ... (Tr. IV/200:6, 201:12.)

...

UNDERWOOD: Your Honor, I also address to Court that I wasn't given all of my material, legal materials. I wasn't afforded. I was only allowed to have one cubic foot of legal materials. So, Your Honor, I had to give [standby counsel] Mr. Collins 15 envelopes that I had other inmates holding of legal pertaining to – give them to him, put in more property, give it to him.
(Tr. IV/222:16.)

... the conditions handcuff me, and it impedes my ability to defend myself. (Tr. IV/223:20.)

3

1

2   "I've submitted documents, contested the accountability of where certain
3   documents came from that they use to justify the security." (Tr. I/6:21.) The judge
    noted that "so far as I know, Mr. [Underwood] has never acted inappropriately in
4   any court ..." 8:24.)

5        Two months before trial, after exhausting his administrative remedies at MCI,

6   Underwood filed a federal lawsuit alleging in part that he was not allowed access to legal

7   materials (law books and discovery) he needed to defend himself. (Pet. Ex. 8.) A month later a

8   hearing was held in the Superior Court in which one issue addressed was that Underwood was

9   being denied legal books, discovery, documents, legal materials, and law library access at MCI.
10
    (Super. Ct. Mot. Hng. vol. 1, p. 8:15 (Apr. 9, 2014).) The Judge stated that he would ask jail
11
12  officials to provide Underwood his legal materials. (*Id.* at p. 12:9-14.) But MCI Superintendent

13  Saba claimed he was not contacted by Court regarding this issue. (See No. 1:14-CV-11055 (D.

14  Mass.), Doc. # 94, Attach. 2, Exhibit A.)

15       In 2016 during discovery in his federal lawsuit, Underwood obtained new evidence in

16  the form of affidavits by Deputy Superintendent Carol Lawton and Superintendent Saba
17
18  admitting that Underwood was not allowed to have any law books, and was afforded only one

19  cubic foot of legal materials. (Pet. Ex. XX (No. 1:14-CV-11055 (D. Mass.), Doc. # 94, Attach. 2,

20  Exhibit A.) And newly discovered emails from Carol Mici (DOC Assistant Deputy

21  Commissioner of Reentry) showed that Underwood was housed at ECCF "as a favor so that the

22  DOC would not get stuck with the cost of transporting and housing Underwood." (Pet. Ex. 1; No.
23
    1:14-CV-11055 (D. Mass.), Doc. # 126, Opp. Def. Mot. Sum. Judg. # 13, Ex. 12).)
24
25       The prosecutor claimed it was given a document by Pelican Bay State Prison, in

26  California, that said Underwood had control over the Bloods and Crips, was a BGF member, was

27  part of a plot to murder a Muslim Imam, was a Black nationalist, and that his sister Tracy

28  worked for the Secret Service and his brother works for the Department of Veterans Affairs.

4

None of this true. The prosecutor claimed that the move was unrelated to the PBSP information.

Underwood found this document in the discovery he was allowed to possess and gave a copy of

this document to the Assistant Director of Security at Essex County, who claimed the facts

therein were the sole basis for the extraordinary security of Underwood in the jail, including

housing him for two years in "the hole" and restricting his access to discovery documents (one

cubic foot), legal books, and the law library. (Pet. Ex. 3; Sept. 17, 2013 Ct. Hng., p. 61.)

**During trial Underwood suffers from withdrawals and sleep deprivation**

During trial Underwood was denied his prescribed medication for severe nerve damage,

which led to withdrawals and sleep deprivation, and further hindered his ability to defend

himself:

> If I seem jumpy and moving, I'm having withdrawals, your Honor. I came down
> from the state prison on Meloxicam. Since I've been in the custody, when I came
> Monday, the deputy was with me when we went to medical. They took me
> straight to medical and I explained to medical I need this medication. … I haven't
> slept in two days and it has me jumping. It has me I haven't slept [sic] So I'm just
> letting Court know so Court don't think I'm under the influence of something,
> something like that. (Tr. IV/13:5-14:6.)

The prosecutor acknowledged that Underwood had not been given his medication. (Tr. IV/14:24-

15:11.) ECCF Director of Security testified that Underwood was not afforded his prescribed

medication, but was offered a replacement and refused. The judge said that they would give him

the one that he had been prescribed that day. (Tr. IV/14:20-25, 16:24.) This never occurred.

As a direct result of the lack of medication and sleep deprivation, Underwood to this day

does not remember Russell testifying, and was not able to fully participate in his trial by way of

making objections, preparing motions, and examining witnesses. (See Def's Decl. Supp. Pet.)

**Prejudicial hearsay identification evidence is introduced**

Andover Police Detective Heseltine testified at trial that, through his investigation, he

"learned" that Underwood was in Binghampton, New York, on June 17, 1988. (Tr. IV/139:12-

5

16.) He also claimed to have "learned" that, at the time, Underwood was driving a red pick-up truck with "A-Tech" written on the side. (Tr. IV/140:1-4.) He did not say how he learned this information. Although Underwood stipulated that he was over 300 miles away in Binghampton, New York less than a month after the attack he did *not*, as the judge acknowledged, stipulate that he was driving a red truck with a specific emblem. (Tr. V/15:5; Tr. II/64:21-65:5.)

The second improper hearsay evidence introduced was further subjective opinion testimony by Heseltine that he believed the mug shot of Underwood taken in 1988 in Binghampton appeared "very close" to the victim's composite sketch Exhibit E/5. (Mot. Dismiss (Sept. 17, 2013) at p. 47:9-49:18.) Through Heseltine the prosecutor introduced two unauthenticated photographs of Underwood from 1988. (Tr. IV/140:14-16.) Heseltine said he received these pictures from an unknown individual at the Binghampton Police Department. (Tr. II/63-64.) He also "learned" that at the time, Underwood was 26 years old, 78 inches tall, and 210 pounds. (Tr. IV/139:22-25.) But Heseltine did not have personal knowledge of Underwood's appearance in 1988. At the time he was an Andover Police Officer. (Tr. IV/128:6-8.) He did not begin working on the Underwood case until 2008. (Tr. IV/128-129.) 1988. (Tr. II/63-64.)

**The court excludes all evidence of third-party culpability**

Underwood sought to introduce evidence of a prime suspect for the attack: a police officer who matched the victim's description, was visiting from out of state at a house two miles away, and was later convicted of multiple rapes and murders. (Tr. IV/192:16.) Court denied his request. (Tr. IV/194:21.) During the initial investigation in this case, David Middleton was a police officer in Miami-Dade County and a suspect. (Tr. IV/142:7, 205:8.) Middleton was subsequently convicted of multiple convictions for rapes and murders across several states including California and Colorado (Tr. IV/211:3.) As an adult he slept in the bedroom with his mother, who practiced voodoo. (Tr. IV/210:16.) Middleton's family told police that during the

6

period of the charged acts he was staying one to two miles from where the victim was abducted, visiting for his mother's funeral, and stayed there for up to eight months, which would be through May 28. (Tr. IV/147:19; 207:22.) (Tr. IV/207.) The victim, who was attacked on May 19, described her perpetrator as a light-skinned African-American who wore strong cologne. (Tr. II/135:3; IV/208:8-17; V/73:14.).) Middleton was a light-skinned African-American who wore strong cologne, according to police interviews with his family. (Tr. IV/208:8-17.)

The prosecutor noted that Middleton should have been in CODIS at the time the victim's sample was submitted for testing. (Tr. IV/205:8.) The prosecutor stated that the "Cellmark test eliminated [David Middleton] as named as a prime suspect in [Underwood's ] theory in his opening". (Tr. IV/22:8-20). But the chain of custody for Middleton's sample was broken as shown below in section 8. Although no evidence was presented on how Middleton was excluded from further investigation, the prosecutor claimed it was based solely on his work time sheets. (Tr. IV/205:4.)

Detective Philip Russell was a patrol officer at the time of the offense, assisting the lead investigator. (Tr. IV/45:19.) He interviewed possible suspects, including Kris Kimber, resembled the victim's description of the perpetrator, and drove the same type of red-colored truck as the assailant, and whose whereabouts on the date of the crime were unknown (Tr. IV/49:12, 52.)

Prior to Russell's testimony, Underwood told Court that he wanted to question him regarding the break in the chain of custody, the truck description, to impeach the victim with her prior statements to him, and other matters. (Tr. IV/36:10, 201, 234:10.)

On cross-examination, the prosecutor elicited from Russell that, even after reading his lead detective's own report, Russell did not recall (1) how he ruled out Kimber as a suspect, (2) how he ruled out Middleton as a suspect, and (3) the victim's response to being shown a

7

photographic array with Kimber's photo. (Tr. IV/58:1, 59:12.) Underwood intended to question Russell about these matters on redirect, but Court inexplicably dismissed Russell after being cross-examined without Underwood being allowed to re-direct. (Tr. IV/59:19.)

Other evidence supported Underwood's alibi defense. The victim said that during her conversations with her assailant while driving, he said he had friends in New Hampshire, and asked where she went to high school. (Tr. IV/90:23.) He then said that he believed he had played basketball in high school against her high school, Lowell High School. (Tr. IV/91:12.)

Another category of third-party defense evidence existed and was excluded. A day before the attack, a vehicle was stolen in Waltham, Massachusetts, 20 miles away from the abduction location that matched the victim's description of her attacker's: a (1) red truck, with (2) a company logo (Crowley Corporation), and (3) lettering on the side, (4) a black pipe rack, and (5) a tool chest in the bed. (Tr. IV/93:14.) Although the victim said she recalled that keys were in the ignition of the truck she was abducted in, the stolen truck was recovered with the ignition pulled out two days later, in Everett, Massachusetts, 17 miles from the abduction location in Everett. (Tr. IV/94:7.) No other information on the truck was obtained, such as the original owner.

**The court denies Underwood's only alibi witness**

As a direct result officials' repeated failure to provide Underwood with access to discovery documents, Underwood was unable to call his only alibi witness to testify, and thus was unable to raise an alibi defense. (Tr. IV/218:1; Tr. V/24:10.)

On the fourth day of trial, Underwood told Court that he had "just received" some information the day before "beneficial to [his] defense" from his private investigator concerning his work supervisor in 1988 at A-Tech Industries, where he worked as an engineering consultant. (Tr. IV/5:17, 218:1, 224:20The day after Underwood was able to review this document, his standby counsel received Jay's address and phone number from the investigator. (Tr. V/4:15.)

8

Underwood's supervisor, Rick Jay, could have testified to many exculpatory facts that would have supported an alibi defense. (Tr. IV/6:4.) Jay would have testified about his personal knowledge of:

- the fact that company trucks did not match the description of the perpetrator's truck, specifically in regards to: (1) a single front seat, (2) a tool box behind the front seat, (3) cursive/script lettering, with (4) gold around it, on the (5) back of the bed, (6) a maroon interior, (7) a black roll bar, (8) and an "all-utility bar behind the cab" (Tr. II/146:14; III/27:11, 57:9, 58:4; IV/81:10, 219: 9; V/77:15-22);

- the fact that the company did not provide uniforms to its employees, since the victim said her perpetrator possibly wore a uniform (Tr. V/78:14);

- the fact that the company had no jobs in Massachusetts or New Hampshire that year;

- the fact that the company's policy was to book and pre-pay employees' hotel reservations and keep records thereon;

- the fact that there was a predetermined schedule for when employees were to arrive at each job site and perform their duties;

- the company policy regarding mileage limitations and location logs which employees were required to keep;

- the policy requiring employees such as Underwood to call in regularly;

- the fact that employees were required to provide receipts (containing store location and date) for food, gas, and expenses as part of their per diem (Tr. IV/221:10); and

- whether there were possibly any photos of A-Tech company trucks in his possession, or that of other employees, or insurance agencies, etc. (Tr. IV/242:5).

The prosecutor questioned why Jay was not located until now, since his address and contact information were provided in a 2010 police report that was part of discovery. (Tr. IV/221:21-222:12.) However, Underwood was not able to review this document until the fourth day of trial because MCI (DOC) denied him access to his discovery.

The prosecutor also claimed that Jay would not be helpful to Underwood because Jay did not recall any specific employees, and had no documents from that period. (Tr. IV/222:4.)

Underwood argued how important it was for Jay to testify as to the discrepancies in the victim's description of the truck, such as those regarding the upholstery color, roll bars, and

9

lettering color. (Tr. V/19:2.) The judge said this was irrelevant, because there was no evidence it

was the same A-Tech:

> COURT: That's all we know. We don't even know what A-Tech is, just that it said
> A-Tech on the side. If Mr. Jay comes up and says I run A-Tech, and our trucks look like
> X, that really gets kind of a big "so what," because we don't know if it's the same A-Tech.
> Someone would have to testify to that. We don't know if the truck that was being driven
> at the ...(Tr. V/19:18, 20:2.)

The Court next claimed that any testimony about the truck was irrelevant because Jay had

previously stated that some employees drove their own trucks and used a magnetic company

logo. Underwood corrected the judge, noting that the prosecution placed him in a company truck

two weeks after the crime in Binghampton, New York. (Tr. V/24:18, 29:21.) The judge conceded

that he could not "remember what evidence the jury has, so far, about A-Tech and the truck ..."

(Tr. V/14:21.) The prosecutor then had to remind the judge that there *was* testimony from an

officer about Underwood operating a red truck with "A-Tech" on the side. (Tr. V/15:4.)

Underwood corrected the judge, noting that the prosecutor had already introduced

testimony that Underwood had been in Binghampton two weeks later in a red A-Tech truck. (Tr.

V/22:6.) The judge then incorrectly stated that there was testimony that some operators used a

magnetic sign on their truck. (Tr. V/23:12.) The prosecutor corrected the judge, noting there was

no such testimony. (Tr. V/23:18.)

The judge never mentioned the fact that other evidence existed that could have

established that Underwood worked for the same A-Tech that Jay did, such as Underwood's IRS

records, company records and filings, Underwood's family and friends, and the VIN from

Underwood's truck that he subsequently got pulled over in.

The judge continued:

> Without any connection, through testimony, between A-Tech Corporation
> and the trucks they were operating at that time, and the truck that Mr. Underwood
> was driving, it would seem to me that the testimony would not be probative in any
> even[t].

1
2          The judge then said that it would take too long for compulsory process to compel Jay to

3     testify, and would not be feasible to continue the trial. (Tr. V/16:19.)

4          Ultimately, the judge said that even if Jay was willing to come testify, and the testimony

5     were admissible, he would not allow it in because of the local publicity in the case, and the risk

6     of the jurors' exposure to it. (Tr. V/24:11.)

7          The prejudice from the erroneous admission of these hearsay statements was exacerbated

8     by the prosecutor during closing. After making a statement which included "incorrect statistical
9
       odds" (App. Ct. Op. at 8), the prosecutor asked rhetorically "what are the chances that the person
10
       whose DNA matches the sperm fraction taken from [the victim] was driving a red truck on June
11
12     17th of 1988, with an emblem on the side?" (Tr. V/153:15-19.) She later asked the jury, again

13     rhetorically "what are the chances that the person whose DNA matches the DNA taken from her

14     that night would look that much like [the composite sketches]? What are the chances he'd be in a

15     red truck with an emblem on the side? What are the chances he'd meet the physical description?"

16     (Tr. V/154:7-12.)
17

18     CROSS-EXAMINATION OF HESELTINE

19          PROSECUTOR: For purposes of the record, I would note another individual who
20          interviewed [the victim] was Commander Heseltine, and Mr. Underwood elected
            not to elicit from him on cross-examination any of the inconsistencies in his
21          interview.

22          I'm troubled by the fact that he keeps raising the fact that he chose not to
23          [cross-examine the victim]. As I said earlier, there are some very strategic reasons
            separate and apart from identification why he chose not to cross-examine [her].
24
25          UNDERWOOD: Your Honor, I don't have – I don't have anything for Heseltine. I
            don't have anything. I don't have all my discovery. Mr. Collins--like I said, I was
26          limited to what I could have possession of. Mr. Collins supplied me with
            discovery. ... I'm limited on discovery I have.
27
       THE SECOND COMPOSITE SKETCH
28
                                              11

Underwood only had one opportunity to view the second composite sketch that the prosecutor introduced at trial, due to the housing restrictions on legal documents. Because this document was not Bates-stamped and had no identifying information—unlike the other composite—Underwood and his attorney believed it was not part of discovery and would not be used at trial. (Tr. II/77:7, 90:19, 93:1; Tr. III/6:14.)

**The DNA chain of custody is broken**

On the evening of the attack, the victim was examined at the Exeter Hospital by Dr. Gary Lamphere. (Tr. III/33:11-14.) Lamphere noted "multiple contusions; bruises about the face and head, and ... a stab wound to the right upper quadrant of her abdomen." (Tr. III/35:12-15.) The "stab wound had perforated her large intestine and had allowed leakage of fecal material into her perineal cavity." (Tr. III/36:2-4.) Lamphere also performed a rape kit. (Tr. III/37-38.) Lamphere turned this evidence over to Exeter Police Detective Lally on May 20, 1988. (Tr. III/40:8; 80:21, Ex. O;(Tr. IV/60:9.) Three days later Lally gave the kit to Detective Sergeant Barnard at the New Hampshire State Police Lab in Concord, who gave it to Susan Faith that same day. (Tr. IV/60:4-9, 69:8-10; Ex. O.)

Susan Faith Faith (hereafter "Faith") (a.k.a. Susan Legsdin Faith, Susan Drouin Faith, and Susan Whithey Faith) was a serologist at the Massachusetts State Crime lab in Concord in May of 1988 . (Tr. III/83:3-13; 87:7-8.) At some point between May 23, 1988 and June 13, 1988, she performed serology testing on the samples obtained from the victim. (Tr. III/88:2-5.) This testing included confirming the presence of unidentified sperm. (Tr. III/90-91, 96.) No blood from Underwood was found.

1. The chain of custody is broken for evidence that purportedly excludes the prime suspect

The chain of custody for the item that was claimed to exclude the prime suspect in the case, David Middleton, was broken, and what was actually tested is unknown. Middleton's DNA

was allegedly tested against Trial Exhibit 1-9a (vaginal swab). (Tr. III/119 [exhibits misprinted as "19A, 19B"].) This item was supposedly given to Faith at Concord P.D. by Hampton P.D. Detective Russell eight years after she had put it in the freezer in Concord. (Pet. Ex. ___ [Tr. Exs. 26 & 27.) But there is no evidence that it ever went to Hampton P.D. When Concord sent the rape kit to Hampton P.D., it did not include Exhibit 1-9a. (Tr. III/120:14.)

Faith testified, and the chain of custody form shows, that the kit Hampton P.D. received from Faith in 1988 did not include Exhibits 1-9a, 1-9b, and 2. (Tr. III/117.) For eight years, according to the chain of custody logs, which has Faith's and Russell's signature, and Faith's testimony, these items were in a freezer in Concord. (Tr. III/118:3-7.) Yet these items were claimed to have been in Hampton during this period. (Pet. Ex. XX [Tr. Exs. 26 & 27].) Since the items could not have been in two places at once, the items that from Hampton could not have been Exhibits 1-9a, 1-9b, or 2, which were in the Concord freezer. Thus there is no evidence where the items from Hampton were, or where they came from. It was these items that were sent to Cellmark to test against Middleton's DNA profile, which allegedly excluded him as a suspect. (Tr. III/119.) Faith could not say if the evidence packaging or the contents of the rape kit were disturbed or tampered with, or what the contents were in the rape kit, or the condition of the clothing, due to the file being destroyed that contained "extensive notes." (Tr. III/87:15-89:10.)

The trial judge noted the break in the chain of custody of the DNA evidence:

... there is a gap in the chain of custody because the items were at one point ... last sent down to the evidence vault at the lab *and the next thing you know they're coming back from the Hampton Police Department.* (Tr. IV/12:20-25.)

...

Well, the water's got a little muddier because there was an indication that a couple of those entries on the chain of custody sheets indicated that *the key pieces of evidence maybe never left the lab.* (Tr. IV/193:23.)

...

13

But when I say they're muddy, at one point it appeared that *there was clearly a break in the chain*, if you will, of custody on the key items. (Tr. IV/195:15.)

## 2. The chain of custody is broken for evidence claimed to implicate Underwood

After the rape kit was received in Concord in 1996, it inexplicably surfaced in Hampton in 2009, without any record of how it got there, where it came from, or where it was during these 13 years. (Tr. IV/77:12-21.) On July 30, 1996, Hampton P.D. Det. Russell relinquished the rape kit to Faith in Concord, New Hampshire. (Tr. III/.) On January 8, 2009 Hampton Detective Gilroy claimed to have possession of the kit, but under questioning from Court, Hampton Lt. Lally admitted that there was no record of how Gilroy came into possession of the evidence. (Tr. IV/77:12-22.) Underwood pointed out to Court that both Gilroy and Russell were taken off the prosecutor's witness list and "they were the two people who broke the chain [of evidence]." (Tr. VI/8:20-22). There is no record of the evidence ever being relinquished from Concord after 1996, prior to it turning up in Hampton. The chain of custody record showed that on January 8, 2009, Gilroy claimed he gave the rape kit to Bill Wallace. But Wallace testified that he did not sign the custody form where it shows his name, but rather that Detective Gilroy put his name on the line saying who received the evidence. (Tr. IV/118:11-17, 122:15-22.) This is the only signature or entry on the chain of custody form that was not made by the person claiming to have relinquished or received the evidence. Yet it was this very evidence that was later used to claim Underwood's DNA matched the victim's sample.

Jana Thomas was a forensic scientist with the Massachusetts State Police Crime Laboratory. (Tr. III/124.) In 2009, she was assigned to analyze evidence from this case. (Tr. III. 125.) As part of her analysis, she prepared several swabs from vaginal smear slides from the kit of unknown origin that came from Hampton P.D. (Tr. III/137:5-13.) She sent the swabs for DNA testing (Tr. III/173-174.)

14

In 2010, Commander Charles Heseltine was a detective with the Andover Police Department. (IV/128:9-11.) In February of 2010, he traveled to California to collect a DNA saliva sample from Underwood's known DNA standard for comparison to the sperm sample recovered from the victim during the rape kit. (Tr. IV/138:5.) He claims he went to a UPS Store and shipped the sample to the Massachusetts State Police Crime Lab. (Tr. IV/139:6.) Jessica Hart, who worked in the DNA Unit of the Lab, processed the known DNA standard for both the victim and Mr. Underwood. (Tr. IV/149-151, 154.)

Sherri Anderson was a forensic scientist at the Massachusetts State Police Crime Lab. (Tr. IV/173:7-109.) She observed some signs of degradation of the DNA in the non-sperm fraction of the vaginal swab but was nonetheless able to obtain a full DNA profile. (Tr. IV/176-177.) That profile matched the victim. (Tr. IV/177:13-19.) She also observed signs of degradation in the sperm fraction of the vaginal swabs, though not to the extent present in the non-sperm fraction. (Tr. IV/178:10-16.) She was able to generate a full DNA profile, which matched Underwood. (Tr. IV/179:3-18.) Based on a statistical analysis performed by Anderson, the probability of this sample matching a random person in the community was roughly 1 in 74.02 quadrillion of the African-American population. (Tr. IV/181:5-18.)

**Evidence of uncharged acts is admitted**

The prosecutor sought to introduce evidence of an uncharged sexual assault on the victim that occurred in Tewksbury, Massachusetts (Tr. II/48:16-17), and a stabbing that occurred in Hampton, New Hampshire. (Tr. II/48:19.) Underwood opposed this. While the Judge explained that if the issue of rape was not contested the jury may not need to hear it, the day before the in limine hearing on whether the uncharged acts evidence should be admitted, the Judge had already told the jury about the uncharged acts:

> COURT: ... The Commonwealth further alleges that Mr. Underwood then beat and raped her inside and outside of his own vehicle before stabbing her and

15

leaving her seriously injured in <u>Hampton, New Hampshire</u>. (Tr. I/29:15-19.)

At the in limine hearing, the judge admitted the uncharged acts evidence need not be admitted:

> COURT: ... are you going to contend that these events didn't happen or is it your position going to be not to contest that they happened but to deny that you were the person who did them?" (Tr. II/51:11.)
>
> UNDERWOOD: Your honor, I don't know what happened on May the 20th, in Massachusetts. I don't know. I just know that I'm in this situation where I have to defend this. But what happened there I don't know. (Tr. II/51:17.)
>
> COURT: Okay. And the reason I ask is because, <u>if the issue of a forcible rape is not contested, then an argument can be made that maybe the jury doesn't need to hear the whole story; but if it is contested, then I think clearly they do have to hear it all</u>. They may hear the whole story anyway, but the decision is an easier one if the fact of a forcible rape is in dispute.
>
> UNDERWOOD: Your honor, our position is I did not have sex with this [victim].
>
> COURT: Okay.
>
> UNDERWOOD: ... <u>What happened, I don't know</u>.
>
> ...
>
> COURT: ... The Commonwealth in that circumstance has to go very thoroughly through all of the elements of the crime, including the force, and, in that regard, the state of mind of the perpetrator towards the victim before and after I think does have relevance in proving the state of mind at the time of the offense.
>
> And, as Ms. MacDougall points out, even if identification alone was the issue, the events, particularly the events that happened, well, the ones that happened all through, are relevant in helping the jury assess what she could have been expected to observe and recall about the perpetrator; so I do think in the end that the before and after is relevant and probative. Otherwise, what the jury would hear is this very truncated version of I was in a truck with a man somewhere on 495 and he forced me to perform oral sex, period, or some other kind of so-called unnatural sex, period. That would give them just an artificial and distorted view of events. I think they do have to know that there's a bigger story than that.
>
> So I am going to allow this motion in limine.
>
> UNDERWOOD: And Court, Your Honor, notes my objection for the record?

COURT: Yes. Yes.

(Tr. II/51-53.)

Underwood did not contest that the prior rapes occurred. Thus, according to the judge's own reasoning, these prior acts must be excluded.

In the prosecutor's closing argument, she opened by focusing on the uncharged acts: the victim's fear for her life during the brutal assault and stabbing in New Hampshire. (Tr. II/143:24-144:9; 146:16-18; 147:16-148:6.) After about three hours of deliberations the jury was deadlocked. (Tr. 6/50:8.) The judge instructed the jury about their duty and sent them back for deliberations. (Tr. VI/64:15.)

Further, appellate counsel falsely stated that Underwood stipulated to the admittance of unauthenticated photographs of Underwood taken less than a month after the attack. But actually, Underwood objected to the admission of these photos, and Court acknowledged that his "rights are preserved on that." (Tr. III/12:3-15; 14:14

After making a statement which included "incorrect statistical odds" (App. Ct. Op. at 8), the prosecutor asked rhetorically "what are the chances that the person whose DNA matches the sperm fraction taken from [the victim] was driving a red truck on June 17th of 1988, with an emblem on the side?" (Tr. V/153:15-19.) She later asked the jury, again rhetorically "what are the chances that the person whose DNA matches the DNA taken from her that night would look that much like [the composite sketches]? What are the chances he'd be in a red truck with an emblem on the side? What are the chances he'd meet the physical description?" (Tr. V/154:7-12.)

**Improper identification hearsay is admitted**

Heseltine's testimony was based entirely on hearsay, and thus the Appeals Court was correct in concluding that they were not authenticated. (App. Ct. Decision, at 5.) Thus, he only could have "learned" these facts through statements made to him by an unidentified individual from

17

1   Binghampton. Since these statements were introduced to prove their truth, they were hearsay.

2   (See Mass. Guide to Evid. 801.)

3   **An unauthenticated, distorted photograph of Underwood is introduced**

4
      The photo most at issue was a profile view of Underwood which appeared to show him
5
    with a "pointy nose" due to a shadow. The victim described the perpetrator as having a "little,
6
7   lengthy," "pointy nose." (Tr. III/57:6.) Underwood's nose in 1988 was, and currently is, large,

8   short, and wide (Tr. II/68:17-69:2.) Underwood thus objected to the use of this photo, because "it

9   gives a false impression of [my] nose," especially blown up by the projector, because it

10  contained an "optical illusion" that "makes it seem like it might be a nose, but, if you look at it,

11  it's [a] shadow." (Tr. IV/7:13-8:6.) The photos were so distorted that Court initially believed they
12
    showed Underwood as being injured at the time the photos were taken. (Tr. II/66:17.) But Court
13
14  realized the problem was that the photograph was distorted by a shadow:

15          I see what your issue is. There's a shadow in the picture which makes the nose
            look a little, if you don't look at it closely, makes it look a little longer and
16          pointier.

17  (Tr. IV/32:18) Underwood suggested that his nose be examined by a doctor to show it had never

18  been altered and was never pointy. (Tr. II/68:17-69:2.)Court promised to instruct the jury to
19
    consider only the original mug shot, not the blown up version, during the deliberations, but Court
20
21  failed to instruct on this issue. (Tr. III/16:2.) And it did not matter anyway, because, as the

22  prosecutor said, "the shadow [was also] in the original photo." (*Id.* at 9:22.)

23          Underwood objected to the introduction of all photos taken in Binghampton, and asked

24  Court and prosecutor to elicit an in-court identification from the victim, but the prosecutor chose

25  not to. (Tr. III/12:3; IV/86:8-24, 218:1-222:15; V/24:18-20 [objection].)

26          Underwood and his first attorney, Mr. Skinner, did not believe composite Exhibit E/5
27
    was a part of discovery because it was not Bates-stamped and was missing the standard
28
                                              18

information that was present on the other composite, such as the date it was made and by whom. (Tr. II/77:7, 90:19, 93:1; III/6:6.) Underwood also did not have access to this exhibit due to housing restrictions, as he told Court. (Tr. III/6:13.)

However, there were two composites done by the victim, and each looked different, as the prosecutor and Court admitted. (Tr. II/79:21, 80:11, 91:11.) Yet the prosecutor sought only to introduce one of them, Exhibit E/5. (Tr. II/79:2.) The victim could not say if one was more accurate than the other, and testified that "[t]hey were both [her] best effort," and "they both look like [the perpetrator]." (Tr. II/83:1; III/25:7.) According to many people, the other composite, Exhibit F/6, looked "exactly" like NBA basketball star Rajon Rondo. (Tr. II/91:13.) Underwood did not look like that in 1998, or at trial. (Tr. II/91:18.) Exhibit F/6 was the composite circulated as a "Wanted" sign by the Andover PD. (Tr. II/96:12.) Underwood objected to the use of either composite. (Tr. II/92:16, 97:2.) The victim's testimony about her perpetrator changed considerably in other respects from her first report. (Tr. IV/226:25-227:16.)

The Appeals Court acknowledged that the statements at issue were hearsay and that the photographs were unauthenticated. (App. Ct. Decision, at 5.) Court erred, however, in holding that this erroneously admitted evidence did not create a substantial risk of a miscarriage of justice. On the contrary, the false evidence thus appeared to support the accuracy of the DNA evidence and likely destroyed any reasonable doubt raised by the gap in the chain of custody. The Appeals court's decision was made on the Appeals attorney's misinformation that Underwood did not object to the unauthenticated photographs. Because Underwood did in fact object, the standard of review should have, but did not, shifts from a "substantial risk of a miscarriage of justice" to Court reviewing for "prejudicial error." This standard is virtually identical to the federal *Brecht* standard for prejudice, namely whether "the judge's error in admitting the improper testimony did not influence the jury or had but very slight effect."

19

(*Commonwealth v. Frangipane*, 433 Mass. 527, 537 (2001).)

## Argument

### I. Petitioner was prejudiced by the violation of his Fifth Amendment right to raise a defense of third party culpability

Because Underwood was not allowed to call his only alibi witness – former work supervisor Rick Jay – as a witness, and was denied from presenting evidence about the primary suspect in the case – David Middleton – he was denied his right to present a defense theory of third party culpability, in violation of the Fifth Amendment under *Mathews v. United States*, 485 U.S. 58 (1988). (See also, *Scrimo v. Lee*, 935 F. 3d 103 (2nd Cir. 2019).)

### II. Underwood was denied his right to access of Courts during his self-representation

### III. Underwood was prejudiced by the violation of his Fifth Amendment right when evidence was improperly admitted purporting to show that Underwood matched the appearance of the assailant and was driving a matching truck less than a month after the attack over three hundred miles from the crime

Because there was such a large and inexplicable break in the chain of custody of the DNA evidence, Underwood's jury likely would have harbored major doubts as to its validity. Underwood argued the importance of the large break in the chain of custody in closing. (Tr. IV/.) At one point the jury was deadlocked. (Tr. VI/50:8). Thus any evidence that appeared to substantiate his presence at the crime scene, or his appearance compared to the victim's description, would have completely eviscerated his case. Both types of evidence were improperly admitted in this case, over Underwood's objection. Because the evidence violated state law and the clearly established holdings of the U.S. Supreme Court, the state court's opinion is unreasonable, and must be rejected.

A. There is a reasonable likelihood that the erroneously admitted hearsay statements substantially influenced the jury's verdict

The prosecutor introduced through leading questions several hearsay statements in an

attempt to prove that Underwood matched the description given by the victim in 1988 and that he was in Binghampton, NY less than a month after the assault while driving a truck that matched the description of the assailant's truck.

The admission of these hearsay statements created a substantial risk of miscarriage of justice, since it was the only evidence that Underwood drove a red truck, and that he was doing so within one month after the attack. These statements were also the only evidence, apart from the alleged DNA, showing that Underwood had ever been within 300 miles of the location of the offense. The prosecution admits this fact (Tr. II/63:212-24) Most importantly, the hearsay testimony was offered in an attempt to establish that Underwood matched the description of the victim's assailant.

It is a violation of a defendant's Fifth Amendment right when hearsay from a detective about his investigational procedures is used to establish the truth of a fact. *Richardson v. Griffin*, 866 F. 3d 836 (7th Cir. 2017).

"It is the obligation of the prosecution to establish the chain of custody for evidence sent to testing laboratories – that is, to establish the identity and integrity of physical evidence by tracing its continuous whereabouts. *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 337 (2009) (dis. opn. Kennedy, Breyer, Alito, Roberts.)

Given the chain of custody issue with the DNA evidence, the jury may have had a reasonable doubt about its accuracy. Thus, it was particularly important for the prosecutor to present some evidence connecting Underwood to the crime. These hearsay statements, and the erroneously admitted photographs discussed below, were the only non-DNA evidence that appeared to connect Underwood to the offense. This strongly corroborated the DNA testimony and likely destroyed any reasonable doubt the jury had about the gap in the chain of custody.

B. There is a reasonable likelihood that the improper introduction of unauthenticated, distorted pictures of Underwood from 1988 had a substantial and injurious influence or effect on the

jury's verdict

Two pictures of Underwood from 1988, which were acquired from the Binghampton Police Department, were admitted over Underwood's objection even though they were not properly authenticated and falsely portrayed Underwood as having a pointy nose. Since these pictures provided the only evidence of what Underwood looked like in 1988 and were used as a comparison to the composite sketches, their admission created a substantial risk of a miscarriage of justice.

*Neil v. Biggers*, 409 U.S. 108, () ID

*Manson v. Brathwaite*, 432 U.S. 98 () ID

"The admission of mug shots into evidence requires reversal on federal habeas review only when the prejudicial value of the photos greatly outweighs their probative value." *Blemehi v. Cannon*, 525 F. 2d 414, 421 (7th Cir. 1975)

Identifying photographs must be suppressed if "the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification."

Underwood also noted that the victim said her assailant "had no [perceptible] accent," and did not "sound black" yet, as he told Court, Underwood had a thick Washington, D.C. accent. (Tr. V/72:14, 73:3; Tr. II/128:5.) The victim also said that her assailant was wearing "cheap cologne." (Tr. V/73:14.) Suspect David Middleton also wore strong cologne on the day of the crime, according to his family. (Tr. IV/208:8-17.)

Yet Court erred in holding that admission did not create a substantial risk of miscarriage of justice even if the pictures corroborated the accuracy of the DNA testing by establishing that Underwood matched the description of the victim's assailant in 1988. But this is completely illogical, because without these pictures and the hearsay statements discussed above, the only inculpatory evidence was the alleged match of the DNA sample. Thus, without this apparent

22

corroborating evidence, the jury may have had a reasonable doubt in the accuracy of the DNA testing due to the multiple breaks in the chain of custody of this DNA evidence.

In tandem with the hearsay statements – which were unlawfully used in an attempt to establish that Underwood matched the description of the assailant and was driving a truck matching the victim's description of the assailant's vehicle a month after the attack – there is a reasonable likelihood that the erroneous admission of the photographs influenced the jury's verdict.

C. The state court opinion denying this claim was unreasonable

The Appeals Court held that there was no substantial risk of a miscarriage of justice since Underwood could have required the prosecutor to produce witnesses from Binghampton to "obviate any evidentiary issues he now claims," but decided not to do so for strategic reasons. (App. Ct. Op. at 5.) While the prosecutor did indicate that it had witnesses from Binghampton available to testify, there is nothing on the record to establish that those witnesses had personal knowledge of the events at issue. Where the offense occurred 26 years prior to trial, there is no basis to conclude these witnesses would have been able to testify free and clear of these same objections. Thus, the prosecutor's indication that it had "witnesses" from Binghampton available cannot be used to justify the admission of this hearsay evidence. Thus the appellate court's opinion is based on an unreasonable determination of the facts.

**IV. Petitioner was prejudiced by the violation of his Fifth Amendment right to introduce exculpatory reliable hearsay evidence**

Underwood was unlawfully restricted from introducing reliable exculpatory hearsay evidence from two crucial witnesses. First, his only alibi witness, Rick Jay, made statements in prior police reports, and to Underwood's attorney, establishing that the company Underwood worked for at the time of the charged acts, A-Tech, did not have any projects or work in Massachusetts or New Hampshire. Jay also made statements about the company trucks in use at

23

the time that clearly distinguish the perpetrator's truck from Underwood's company truck. Since

Underwood was not allowed to call Jay as a witness due to the late hour in which he discovered

Jay's address (due to his lack of access to discovery), it was incumbent on Court to allow another

means to introduce this crucial hearsay evidence. There is no indication that the evidence was

unreliable, since Jay made his statement to the police years earlier while the facts were still fresh

in his memory.

Second, Underwood was prevented from introducing statements from the primary

suspect's family showing that this suspect – David Middleton – was staying at his family's house

one to two miles away from where the victim was abducted. This suspect matched the

description of the perpetrator, and was later convicted for multiple rapes and murders occurring

before and after the charged acts.

A court's exclusion of reliable hearsay evidence that is vital to the defense theory of the

case violates a defendant's right to due process under the Fifth Amendment. (*Chambers v.*

*Mississippi*, 410 U.S. 284 (1973); *Alvarez v. Ercale*, 73 F. 3d 223 (2nd Cir. 2014); *Kubsch v.*

*Neal*, 838 F. 3d 845 (7th Cir. 2016).) And where a defendant is denied the right to present

evidence of significant probative value, it also violates the Fifth Amendment. (*Washington v.*

*Texas*, 388 U.S. 14 (1967). *Hicks v. Oklahoma*, 447 U.S. 343 (1980).) Because this error also

violated state law, and Underwood's conviction was a result therefrom, the error also violated his

right to due process under the Fifth Amendment under *Estelle v. McGuire*, 502 U.S. 62 (1991).

**V. Underwood was prejudiced by the violation of his Fifth Amendment right to a fair trial by the unlawful admission of uncharged sexual assaults**

Nothing that happened in New Hampshire was relevant to any of the charges against

Underwood. The judge acknowledged that if the issue of rape was not contested, then the jury

may not need to hear about the evidence related to these charges. (Tr. 2:51-52.) Underwood did

not contest that the prior rapes occurred, since he did not commit them and had had no

24

1  knowledge of them. Thus, according to the judge's own reasoning, these prior acts must be

2  excluded. Judge says that the "state of mind of the perpetrator towards the victim before and

3  after" is relevant, and victim's ability to perceive and recall events. But the judge then made

4
   completely reversed himself and said that if the New Hampshire conduct does not come in the
5
   jury will have "an artificial and distorted view of the events." (Tr. II:53.) He then allowed the
6
7  motion. Underwood objected. (Tr. II:53.)

8       The judge had duty to mitigate the prejudicial effects of this uncharged acts evidence, but

9  did not do so. He could have, for example, allowed victim to testify that she was driven into NH,

10 spent some time with perpetrator, or that victim was attacked and left on side of road. Or he

11 could have limited the testimony to a brief statement that she was attacked or stabbed, without

12
   doctors and nurses going into detail about the New Hampshire attack.
13
14      The prosecutor capitalized on the judge's erroneous ruling, making her entire closing

15 argument about the victim's fear for her life and the brutality of attack in New Hampshire.

16      The uncharged acts evidence allowed was the victim's testimony of a prior rape, which

17 they believed occurred in what would have been Tewksbury, outside the jurisdiction of

18 investigating authorities in Andover, and that this event ended with the stabbing and beating in

19
   Hampton, New Hampshire. (Tr. II/48:8-19, 143:13-147:25; IV/134:15.) The prejudicial effect
20
   was exacerbated by the prosecutor's closing argument, which she opened by focusing on the
21
22 victim's fear for her life and the brutality of the assault and stabbing in New Hampshire. (Tr.

23 II/143:24-144:9; 146:16-18; 147:16-148:6.) Under the guise of giving the jury the "whole

24 picture," the prosecutor actually used the evidence to try to get the jury to convict Underwood

25 based on uncharged acts. This inflammatory evidence, combined with the identification hearsay

26 from Heseltine and what the Appeal Court acknowledged were "incorrect statistical odds" (App.

27
   Ct. Op. at 8) clearly had a combined prejudicial effect of immense proportions.
28

The Appeals Court erred in holding that the statistics misstatement "did not have an impact on the verdict" since "jurors are presumed to be capable of discounting excessive claims." (App. Ct. Op. at 8.) Given the relatively confusing nature of the statistical probabilities, there is no reason to believe that the jury would have been capable of recognizing that this was an excessive claim. Since the prosecutor's success or failure at trial hinged entirely on whether the jury was confident in the accuracy of the DNA match, this misstatement likely made the difference in the jury's mind.

**VI. Petitioner prejudiced by the violation of his Fifth Amendment right to exclude a juror who was sexually assaulted by a perpetrator who was never reported charged**

(Tr. I/243:16-19.) [1p. 17 App. Ct. brief]

Was alternate, but impaneled when other juror in car accident. (VI/6:4-15.)

*English v. Berghuis*, 900 F. 3d 804 (6th Cir. 2018) (juror failed to disclose sexual assault which would have allowed a for-cause challenge).)

**VII. Underwood was denied his right to appeal Court's ruling on his motion to dismiss**

At his April, 9, 2014 hearing, Underwood asked Court for the transcripts of a September 17, 2013 hearing on his motion to dismiss the indictment due to the prosecution's telling the grand Jury prejudicial incorrect information.

UNDERWOOD: I need to have transcripts.

...

On February the 13th, I filed a motion notifying Court of my intent to appeal. ... I did point out in there that I needed the transcripts, which was one of the requirements for the [Supreme Judicial Court]. I haven't received them.

(Tr. I/4.)

Court said it would facilitate the request for transcripts and that Underwood's attorney

26

would get them. Underwood's trial attorney was made aware of his attempts to petition the Supreme Judicial Court on this matter prior to trial and was denied the transcripts he was required to have according to the Supreme Judicial Court. (Tr. I/5:10.)

The denial of transcripts to an indigent defendant for the purposes of filing an appeal is a violation of his Fifth Amendment right to due process under *Griffin v. Illinois*, 351 U.S. 12 (1956). In this case, Underwood was also denied his right to appeal at all.

**VIII. Petitioner was prejudiced by the violation of his Fifth Amendment right to cross-examine a material witness**

A court's unfair restriction of a defendant's right to cross-examine a key prosecution witness violates the defendant's Fifth Amendment right to due process. (*Delaware v. Van Arsdall*, 475 U.S. 673 (1986); *Davis v. Alaska*, 415 U.S. 308 (1974).)

**IX. The state court unreasonably applied controlling authority in concluding there was no prejudicial constitutional violation in the prosecutor's misstatement of the significance of the DNA statistics during closing argument created**

The prosecutor misstated the significance of the DNA statistics in a way which suggested that it was scientifically impossible for anyone other than Underwood to have committed the crime. This likely influenced the jury's verdict.

In closing argument, the prosecutor misstated the significance of the DNA statistics, implying that it was scientifically impossible for anyone other than Underwood to have committed the crime:

> [I]t is like a roll of the dice, those statistics, except this die, you'd have to roll a minimum of seventy-four quadrillion times before you'd see that number again. And there are not even close to that many people on the planet.

(Tr. V/153:7-12.) The Appeals Court agreed that this "analogy to a roll of the dice included incorrect statistical odds." (App. Ct. Op. at 8.) It would have been correct to state that if you rolled a die twice, the likelihood or probability of that number coming up on both rolls would be one in seventy-four quadrillion. Although the likelihood is slight, it would indeed be possible for

27

1 the number to come up twice in a row. It is not true that you would have to roll the die at least

2 seventy-four quadrillion times to see that number again.

3      Misstating DNA statistics is highly prejudicial. Indeed, DNA matches are only

4 admissible under state law when accompanied by statistics informing the jury "about the

5 likelihood of that match occurring." (*Commonwealth v. Mattei*, 455 Mass. 840, 850 (2010)

6 (quoting *Commonwealth v. Curnin*, 409 Mass. 218, 222 n.7 (1991)); see also *Commonwealth v.*

7 *Rosier*, 425 Mass. 807, 813 (1997) ("[e]vidence of a match based on correctly used testing

8 systems is of little or no value without reliable evidence indicating the significance of the match,

9 that is, evidence of the probability of a random match of [the victim's or] the defendant's DNA in

10 the general population").) To misstate the significance of those statistics in such a way as to

11 imply that they were definitive is a substantial error, no different than if the statistics did not

12 accompany the match in the first place.

13      The prejudice from this misstatement is heightened by the prosecutor's statement that

14 "there are not even close to that many people on the planet." Together with the statistical error,

15 these statements suggest that it would be impossible for two people's DNA to have this same

16 profile, thus rendering Underwood the only person on the planet who could possibly have

17 committed the crime. Yet, while the likelihood is slight, it is possible that more than one person

18 had this DNA profile. Not only did the prosecution present this false evidence to the jury, but it

19 compounded the prejudicial effect by including claims of uncharged acts.

20      A prosecutor's misrepresentation of material evidence violates a defendant's right to due

21 process under the Fifth Amendment. (*Berger v. United States*, 295 U.S. 78).) Moreover, a

22 "prejudicial statement made during closing argument 'militate[s] in favor of reversal' because

23 they are 'the last words spoken to the jury by the attorneys.'") (*United States v. Manning*, 23 F.

24 3d 570, 57 5 (1st Cir. 1994).)

25 **X. Underwood was prejudiced by the violation of his Fifth Amendment right to the**
26     **effective assistance of appellate counsel by counsel's failure to raise or exhaust**
    **meritorious claims in State court, and his failure to federalize the claims he did raise**

27

A. Counsel failed to raise meritorious claims

28

1   Appellate counsel failed to raise several meritorious claims that Underwood brought to

2   his attention. (See Pet. Ex. XX.) While it is true that "[a]ppellate counsel is not required to raise

3   every non-frivolous claim, but rather selects among them to maximize the likelihood of success

4   on the merits," nevertheless, counsel is required to raise potentially meritorious claims. (*Zavala-*

5   *Marti v. United States*, 448 F. Supp. 3d 109, 118 (D.P.R. 2020).)

6   

7   Counsel also incorrectly stated in his brief, several times, that Underwood did not object

8   to Courts introduction of evidence when Underwood clearly did object to on the record. This

9   resulted in the Appeals Court's decision being ruled on the incorrect standard of review. (Pet. Ex.

10  

_____

11  3. Underwood has filed a Motion for New Trial in the Superior Court regarding the
ineffective assistance of his appellate counsel for failing to raise to the Supreme Judicial Court
12  the issue of the trial court erring in admitting evidence of inflammatory and irrelevant uncharged
conduct, thus leaving it unexhausted and Underwood unable to raise it in federal court.
13  XX; Brief of Def. 23.)

14  

15  B. Counsel failed to exhaust claims based on his false belief that he was limited to a 10-page
    brief

16  Appellate counsel raised the following issues on direct appeal, but contrary to his promise

17  to Underwood, failed to raise them in his brief exhausting state remedies to the Supreme Judicial

18  Court:

19  

20  I. Court erred in denying Mr. Underwood's for-cause challenge on a deliberating
    juror who was previously the victim of sexual abuse. (App. Br. 19.)

21  

22  IV. Court erred in denying Mr. Underwood's motion to dismiss the indictment
    where the prosecutor exposed the grand jury to inaccurate and prejudicial
23  information. (App. Br. 34.)

24  V. Court erred in admitting evidence of inflammatory and irrelevant uncharged
    conduct. (Pet. Ex. XX; App. Br. 37.)

25  

26  Appellate counsel wrote Underwood that he dropped the three claims because his brief

27  was limited to 10 pages. (See Pet. Ex. XX.) But there is nothing stopping an appeals attorney

28  from requesting leave to file an appeal longer than the 10-page limit, and leave to do so is

29

1  routinely granted. (See, e.g., *Wood v. Ryan*, 283 F. Supp. 3d 297, 300 (D. Mass. 2017) (appellate

2  counsel filed 50-page brief to Supreme Judicial Court on nine claims).) The appellate court brief

3  *did* raise these issues, so there was no justification for counsel to drop the two most viable claims

4  without Underwood being informed beforehand, especially since Underwood had previously told

5  counsel these were his strongest claims, and did his prior appellate counsel Michael Fellows.

6  Counsel's decision was thus not strategic, but rather clearly ineffective

7

8  C. Counsel failed to federalize any claims, despite Underwood's request that he do so

9       On direct appeal, counsel federalized Underwood's claim regarding the challenge for

10  cause of a juror, but failed to federalize any other claims despite promising Underwood he would

11  do so. (App. Br. 19.) In fact, Underwood received notification of the denial of his SJC appeal

12  *before* being notified of the denial of the lower appellate court brief. It was only then that

13  Underwood learned that the claims he and appellate attorney agreed would be raised were not

14  raised, and that none of the raised claims were federalized. Since state law violations are not

15  cognizable on federal habeas corpus, counsel's failure to federalize the claims resulted in a

16  potential loss of federal review absent. (*Kater v. Maloney*, 459 F. 3d 56, 61 (1st Cir. 2006).)

17

18                                     **Conclusion**

19       WHEREFORE, for the foregoing reasons, Petitioner respectfully requests that this Court

20  order Respondent to show cause why this petition should not, and upon full hearing, issue a Writ

21  of Habeas Corpus ordering Respondent to release Petitioner within 60 days, and order such

22  further relief as deemed just.

23

24       Dated: September 9, 2021

25

26                                     Respectfully submitted,

27

28                                     Valentine Underwood,